*1466
 
 Springer, J.,
 

 concurring:
 

 I concur in the judgment of the court and point out that there are clearly a number of irrefutable legal reasons why two disqualified justices cannot be allowed to intervene in a case through the guise of an “administrative conference” and start cancelling out the decisions made in a case and controversy in which they were disqualified to sit. I will supply these legal reasons later, but at the outset I want to stress only the common sense aspects of this case, for I am confident that any reader of this opinion, lawyer or layperson, will understand, before I write another word, that a case duly decided by this court cannot properly be reversed or set aside by any combination of dissenting and disqualified justices who claim jurisdiction simply by changing their roles from judicial to administrative.
 

 By way of simple illustration, consider a hypothetical case decided by a district judge who later discovers that his predecessor, who was expressly disqualified in the same case, had signed and filed in that case an “administrative order” declaring the judgment entered by the duly-appointed successor judge to be “void.” It seems odd to contemplate any judge engaging in such untoward conduct, but the fact of the matter is that we are now faced with similar conduct being engaged in by three members of this court.
 

 I think of a number of supreme court cases that have been decided by a panel of five jurists in which two of the panel members are district judges who have been constitutionally designated to “sit in the place” of disqualified justices. If these three justices were now permitted to set aside the judgments of this court merely by signing an in-chambers, “administrative” order, dissenters in any case could simply join with the disqualified justices in an “administrative conference” and overrule any case and controversy that was not to their liking. Thus, if the actions taken by the three justices in this matter are allowed to stand, any future decision of the court in which jurists were substituted for disqualified supreme court justices is in jeopardy. Such an action would disregard
 
 stare decisis
 
 and predictability in the law, and any case or controversy decided by a duly-constituted panel of this court would be subject to an overruling by a majority of three assembled in an “administrative conference” set at their pleasure. The rule of law would thus, in such cases, be supplanted by the preferences of disqualified jurists who, in the exercise of raw power could overrule decided cases at will.
 

 In the above example of a district judge discovering that a previously-disqualified judge had filed an order superseding the lawful judgment of the court and declaring the court’s judgment “void,” there would at least be a remedy — the supreme court would, posthaste, cancel out such an attempt by a disqualified
 
 *1467
 
 judge to reverse a legal decision of the court. There is, unfortunately, no one to appeal to when justices of the supreme court act in this way.
 

 There is, of course, absolutely no legal basis for the action taken by Justices Young, Rose and Shearing. In addition to the invalidity of the subject order based on the disqualifications of Justices Young and Rose to sit in the Whitehead case, as noted previously, the “order” has denied notice and the opportunity to be heard to Petitioner Whitehead and the Commission. The fugitive “order” is also in violation of established court rules. Finally, and very importantly, at least one of the three justices is the subject of the Special Master’s inquiry.
 

 At this juncture, I think it is important for the reader to understand more fully the actions of this court which the three justices seek to declare “void.” It should first be said that the decision of the
 
 Whitehead
 
 court that Justices Young, Rose and Shearing have attempted to declare “void” is the court’s duly-entered order of February, 1995, which granted Judge Whitehead’s motion to appoint a master. The motion was vigorously opposed and was the subject of oral argument to the court. The issue decided by the
 
 Whitehead
 
 court was whether inquiry should be made into the breaches of confidentiality that had been occurring in the
 
 Whitehead
 
 case. The issue was so serious that even the Nevada District Judges Association wrote an unsolicited letter to then Chief Justice Rose urging that he take measures to “investigate the source of these [confidentiality] violations of state law and to take whatever steps are necessary to put a stop to the practice.”
 

 Article 6, section 21(5), of the Nevada Constitution provides: “The supreme court shall make appropriate rules for: (a) The confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge.” Following the stated constitutional mandate, this court adopted rules relating to confidentiality, which provide in ARJD 6 that any “person who breaches the confidentiality of judicial discipline proceedings is subject to being found guilty of contempt of the supreme court.” Each member of this court has sworn an oath to “support, protect and defend the Constitution of the State of Nevada.”
 

 The Commission on Judicial Discipline commenced its activities in 1977. Approximately two years after it came into existence, the Commission began the practice of releasing confidential information relating to judges in a manner that was violative of the Constitution and Commission rules of procedure. These unlawful practices were discontinued in the 1980s but resumed in the 1990s, accompanied by another unlawful practice, that of making secret agreements with judges and imposing secret pun
 
 *1468
 
 ishments that were in violation of the constitutional provision quoted above.
 

 I do not understand why the Commission has persisted in violating the Constitution by permitting confidential material to be released to favored press sources and by imposing secret punishments upon judges. Judges who have been the victims of these practices suggest that those responsible for these unlawful actions believed that they were enhancing their own power by currying favor with certain influential media sources and by holding over the heads of judges the threat of public disgrace if judges resisted too strongly the will of the Commission.
 

 Before Judge Whitehead filed his challenge to illicit Commission practices, the members of this court were already aware of a number of constitutional violations being engaged in by the Commission. In one case, during confidential proceedings relating to a rural judge, the judge became the object of press accounts which alluded to supposed secret sources within the Commission itself. These planted news stories falsely attributed unfounded charges of sexual harassment and other sexual misconduct to a judge. Other comparable misuses of the system had been called to our attention by outraged judges; and, as a result of these revelations, some members of the supreme court became very much concerned about what the Commission was doing.
 

 The constitutional violations that emerged in the
 
 Whitehead
 
 case (putting confidential Commission files into the hands of a friendly “investigative reporter”) were merely the culmination of similar events in the past and inarguably the most brazen and destructive instances in the chain of constitutional violations. The Commission is the legally-designated custodian of these records, and escape of these records was becoming more the rule rather than the exception. It also became apparent that certain reporters, particularly certain members of the Capitol press corps, were more favored than others and that there was, perhaps, an organized scheme to avert constitutional confidentiality provisions entirely.
 

 Judge Whitehead moved this court to appoint a master to investigate violations of his right to confidentiality and other claimed constitutional violations. Records in the
 
 Whitehead
 
 case revealed not only that confidential information was being unlawfully planted with favored media outlets, it also disclosed Commission practices in which judges were coerced into making secret “agreements” with the Commission that resulted in the imposition of punishments that were never made known to the public. Notable among these secret punishments was the practice of putting judges on “probation” to the attorney general’s office, a practice which resulted in judges having to make rulings in cases where their “probation officér” from the attorney general’s office was appearing before them as counsel.
 

 
 *1469
 
 The manner in which the Discipline Commission has been conducting its business presents a very serious threat to the independence of the Nevada judicial system; 'and it is primarily this concern that prompted this court to institute an inquiry into the practices described above. Contrary to the position taken by certain elements of the media that have been closely involved with the mentioned practices, the purpose of this court’s appointing a master is neither to investigate the press nor to exact “vengeance” against anyone for embarrassing the court or its members. I cannot fault responsible members of the press for faithfully and accurately printing contraband material that was delivered to it by persons who were willing to violate the Constitution and laws of this state.
 

 It was the concern of a majority of the
 
 Whitehead
 
 panel (as it should be for all members of this court) that the mentioned unlawful practices appeared to be carried out in such a way as to degrade the courts, the judges and the Commission itself, and that judges at all levels of our court system were being denied due process of law. Moreover, the public was being denied the open processes of judicial discipline proceedings that the Commission’s own rules expressly required.
 

 Returning now to the issue at hand, and although it is certain that under no conditions could the three justices have assumed lawful jurisdiction to overrule any aspect of the
 
 Whitehead
 
 decisions, very little argument is required to show that the Judicial Discipline Commission and Judge Whitehead had to have received notice and the opportunity to be heard before the substantial rights of the parties could be altered.
 

 I would not venture to say whether the Discipline Commission would now be in favor of a continued investigation of the violations of law that took place in the
 
 Whitehead
 
 proceedings; but certainly the Commission should have been given notice and an opportunity to be heard before any action was taken by this court or by any individual justices.
 

 The motion by Judge Whitehead to appoint a special master was granted by four of the five members of the
 
 Whitehead
 
 court. The judgment has long since been final and is not subject to challenge. The idea that Judge Whitehead could be lawfully deprived of his rights through some kind of ersatz, “administrative” machination, involving two disqualified justices and a dissenting justice, is at total odds with any known conception of jurisdiction, fairness and due process.
 

 There is a third reason, aside from the disqualification of Justices Young and Rose and the due process considerations discussed above, why the three justices should not be allowed to thwart the investigation commenced by Special Master Herbert Ahlswede. The reason is that evidence gathered in the Master’s
 
 *1470
 
 preliminary investigation by the Special Master (before Justices Young, Rose and Shearing stopped him) points reliably to the possibility that at least one of the justices who signed the order may be involved in the breaches of confidentiality which are the subject matter of the investigation. In other words, it appears as though some of the justices may possibly be trying to put a stop to an investigation in which they themselves might be the targets.
 
 [1]
 

 Although Justices Young, Rose and Shearing have signed an order purporting to put a stop to Mr. Ahlswede’s investiga-tional activities, Mr. Ahlswede did have time, before the justices were able to thwart the investigation, to gather some vital documentary evidence and take some witness statements. From the information provided by Mr. Ahlswede to the Chief Justice, it can now be said with confidence that the investigation was clearly on its way to the discovery of information that would be of exceptional interest to the judiciary and to the public. It is now established beyond question that the Special Master’s investigation was anything but an unfounded “witch hunt,” as it has been described by Justices Young and Rose. Among other significant discoveries by the Special Master, the identity of some of the persons responsible for the breaches of confidentiality have been discovered, and there is every promise of discovering all of the persons who engaged in what appears from presently available data to have been a deliberate conspiracy by a number of persons to violate the constitution and laws of this state.
 

 Because the Special Master’s investigation is not complete and could be impeded by a premature release of the identity of any of the persons being investigated by the Special Master, I say no more about the investigation at this juncture. Suffice it to say for present purposes that two of the three justices who signed the September 1 order were themselves the subject of the investigation that these justices have ordered to be stopped. Even if these justices had had the authority to intervene in this case and the power to countermand the orders and decisions of this court, it would be a clear conflict of interest for them to order the cover-up and stoppage of an inquiry which tragically appears to involve one or more of the justices themselves.
 
 [2]
 

 
 *1471
 
 In conclusion, then, because: (1) Justices Young, Rose and Shearing have no jurisdiction to set aside the rulings of this case; (2) Justices Young and Rose are disqualified to act in any way that relates to this case; (3) the “order” declaring decisions of the
 
 Whitehead
 
 court in this matter void constitutes a clear denial of due process to the parties to this litigation; and (4) actual conflicts of interest prevent Justices Young, Rose and Shearing from acting in any way that would thwart the Special Master’s investigation, I concur in the judgment of the court.
 

 [1]
 

 It is noteworthy that in her dissent in this case, Justice Shearing wrote that
 
 “there is evidence
 
 that some of the [unlawful] disclosures may have come . . . from the court itself.” (Emphasis furnished.)
 

 [2]
 

 It should be noted that as independent grounds (in addition to the jurisdictional, disqualification, due process and conflict of interest reasons) for setting aside the subject order of September 15, 1995, Justice Rose (who was chief justice during the pendency of the Whitehead case) and Justice Young (who was and is Vice Chief Justice during the pendency of the Whitehead case) are precluded from taking any action that relates to the Whitehead matter by SCR 7(5) which- provides: “In the event the Chief
 
 *1471
 
 Justice or the Vice Chief Justice is either disqualified or wishes to recuse himself in regard to the decision
 
 of any litigated matter, he is also precluded from undertaking any administrative action with regard thereto.”
 
 (Emphasis added.)
 

 Further, NRS 2.140 provides that the transaction of judicial business of the supreme court requires “the concurrence of three justices who heard the argument.” Justices Young and Rose, disqualified from the Whitehead case, obviously are not justices “who heard the argument” in the Whitehead matter; therefore they are barred by NRS 2.140 from transacting any business relating to that case.